J-S41028-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: J.H. AND S.M., MINOR CHILDREN | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| . | |
| APPEAL OF: G.H. | No. 213 MDA 2017 |

Appeal from the Decree entered December 20, 2016
In the Court of Common Pleas of Lycoming County
Orphans' Court at No(s): 6501

BEFORE:  GANTMAN, P.J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED JULY 03, 2017**

G.H. (Father) appeals from the trial court's December 20, 2016 decree involuntarily terminating his parental rights to his children, J.H. (born 2/2009) and S.M. (born 6/2010) (collectively, Children).  After careful review, we affirm.

Children were born in Tennessee.  In 2012, Children were removed from the family home and adjudicated dependent and placed in temporary foster care.  Father separated from Mother[1] in the spring of 2013.  In April 2013, Tennessee Children Services gave physical custody of Children to paternal grandmother, R.S. (Grandmother), after she was approved as an appropriate placement.  Father currently lives in Tennessee; Grandmother

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Mother, whose parental rights to Children were also terminated, is not a party to this appeal.

lives in Lewistown, Pennsylvania. From March 2013 throughout 2014, Father claims that he attempted to contact Grandmother by phone several times a week to find out the status of Children. Father visited Children for three days in June 2015 when he was in Pennsylvania for his grandmother's funeral. Father last saw Children in October 2015.

On April 26, 2016, Grandmother filed the instant petition to involuntarily terminate Father's parental rights[2] under 23 Pa.C.S. §§ 2511(a)(1), (a)(2), and (b) of the Adoption Act.[3] On November 17, 2016, the court held a termination hearing. On December 20, 2016, the trial court issued a decree terminating Father's rights. Father filed his notice of appeal on January 31, 2017. On appeal, Father raises the following issues for our consideration:

    (1)    Whether the trial court erred in determining that clear and convincing evidence existed to show that [Father] had a settled purpose to relinquish a parental claim under 23 Pa.C.S.A. § 2511(a)(1) in that Father was rebuffed by paternal grandmother in his attempts to maintain contact with the Children and perform parental duties and utilized all available resources to overcome obstacles [erected by the] . . . custodial parent.

_____

[2] In June 2016, Father filed a custody petition in Tennessee. In July 2016, the Tennessee Circuit Court determined that Pennsylvania is the appropriate forum for litigating the current custody matter. Tennessee relinquished jurisdiction and transferred Father's petition to Pennsylvania. On August 1, 2016, the Lycoming County Court of Common Pleas incorporated the Tennessee order into the current certified record.

[3] *See* 23 Pa.C.S. §§ 2101-2910.

> (2)    Whether the trial court erred in determining that clear and convincing evidence existed to show that [Father's] rights should be terminated under 23 Pa.C.S.A. § 2511(b), in that the developmental, physical, and emotional needs and welfare of the Child are not best served by terminating Father's parental rights.

Father's Brief, at 4.

Before we reach the merits of this appeal, we must address Grandmother's renewed claim[4] that this appeal should be quashed as untimely filed. In general, a party invokes appellate jurisdiction by filing a notice of appeal within 30 days of a judgment, decision, decree, sentence or adjudication that disposes of all claims and all parties. **See** Pa.R.A.P. 903(a) (a "notice of appeal . . . shall be filed within 30 days after the entry of the order from which appeal is taken"); Pa.R.A.P. 102 (defining the term "order" for purposes of the appellate rules to include a judgment, decision, decree, sentence or adjudication); Pa.R.A.P. 341(a) and (b)(1) (providing that appeals as of right may be taken from "final orders" and defining that term). Instantly, the final order from which Father appeals is the court's December 20, 2016 decree involuntarily terminating his parental rights to Children. The order was time-stamped and docketed in the trial court on December 20, 2016.

---

[4] Grandmother filed a motion to quash Father's appeal as untimely. On March 27, 2017, our Court, in a per curiam order, denied the motion without prejudice to Grandmother's right to raise the issue again in her appellate brief. Grandmother has raised this issue in her brief.

Pursuant to Pa.R.A.P. 108(b), the date of entry of an order is the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. No. 236(b). **See** Pa.R.A.P. 108(b). An order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given. Where there is no indication on the docket that Rule 236(b) notice has been given, then the appeal period has not started to run. This is a bright-line rule, to be interpreted strictly. **In re L.M.**, 923 A.2d 505, 509 (Pa. Super. 2007). Moreover, the fact that the appealing party did receive notice does not alter the rule that the 30-day appeal period is not triggered until the clerk makes a notation on the docket that notice of entry of the order has been given. **Id.** Here, the docket does not indicate when and if Rule 236(b) notice of the termination decree was given to the parties. Thus, under **In re L.M.**, the 30-day rule was not triggered and Father's notice of appeal will not be considered untimely.

Moreover, while Father did not concomitantly file a concise statement of errors complained of on appeal, as required by Pa.R.A.P. 1925(a)(2)(i), on February 22, 2017, this Court directed Father to file his concise statement by March 6, 2017. Father timely complied by filing a concise statement with the trial court and opposing counsel, a copy of which was then transmitted to this Court. Because no one has objected or claimed any prejudice as a result of Father's failure to file a concise statement until ordered to do so by this Court, we will accept his concise statement. **See In re Adoption of**

*C.J.P.*, 114 A.3d 1046, 1049 n.4 (Pa. Super. 2015), citing *In re K.T.E.L.*, 983 A.2d 745 (Pa. Super. 2009) (holding that parent's failure to comply strictly with Rule 1925(a)(2)(i) did not warrant waiver of claims, as there was no prejudice to any party).

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). *See also In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006) (party seeking termination of parental rights bears burden of proving by clear and convincing evidence that at least one of eight grounds for termination under 23 Pa.C.S. § 2511(a) exists and that termination promotes emotional needs and welfare of child set forth in 23 Pa.C.S. § 2511(b)).

After a careful review of the certified record, relevant case law and the parties' briefs on appeal, we affirm the trial court's decree involuntarily terminating Father's parental rights based upon the cogent opinion, dated December 20, 2016, authored by the Honorable Joy Reynolds McCoy. As

Judge McCoy concludes, termination is proper under section 2511(a)(1)[5] where "Father failed to bring [the fact that he is employed, goes to counseling, receives services through the VA, and has a stable residence] to the attention of Grandmother or the Court and did not actively pursue regaining custody of the Children until after the Petition for Termination was filed." Trial Court Opinion, 12/20/16, at 14. While Father claims he called or texted Grandmother "at least 3-4 times a week," N.T Termination Hearing, 11/17/16, at 150, parental duty requires "continuing interest in the child and a genuine effort to maintain communication and association with the child." *In re Burns*, 372 A.2d 535, 540 (Pa. 1977) ("[A] . . . child needs more than a benefactor, *parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'*"). Moreover, despite Father's claim that Grandmother "made [his] attempt at maintaining contact with his children very difficult by simply not replying to text messages and not answering phone calls," N.T. Termination Hearing, 11/17/16, at 150-151, the trial court found Father's obstructionist claims to be invalid. *See* Trial Court Opinion, 12/20/16, at 1. Simply put, Father "exhibited a lackadaisical attitude towards his parental responsibilities and was content to sit back and allow someone else to tend to the everyday

---

[5] We note that an appellate court need only agree with the trial court as to any one subsection of § 2511(a), as well as § 2511(b), in order to affirm. *In re Adoption of C.J.P.*, 114 A.3d 1046 (Pa. Super. 2015).

needs and welfare of his Children. *Id.* at 12. Unfortunately for Father his efforts are "too little, too late."

With regard to termination under section 2511(b), while Father admittedly loves Children, he has failed to provide Children the comfort, security and closeness they fundamentally need. Angela Lovecchio, esquire, Guardian Ad Litem, testified that there was no apparent bond between Father and Children. N.T. Termination Hearing, 11/17/16, at 245. Accordingly, the court concluded that there was no longer a beneficial parent-child bond that would be destroyed by terminating Father's parental rights, *id.* at 16, termination would serve the needs and welfare of Children who are thriving and happy in a loving home with their pre-adoptive parents whom they call "mommy and daddy." *Id. See In the Interest of M.T.*, 101 A.3d 1163, 1182 (Pa. Super. 2014) (termination of parental rights proper under section 2511(b) where Children were "developing very well" and were "very bonded" with pre-adoptive foster parents; foster parents were meeting Children's needs and they were "thriving and growing and developing in the adoptive home.").

We instruct the parties to attach a copy of Judge McCoy's opinion in the event of further proceedings in the matter.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/3/2017

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE: : NO. 6501

J█████ H█████ and :
S█████ M█████, :
  minor children, :

## OPINION AND ORDER

AND NOW, this 20th day of December, 2016, before the Court is a Petition for Involuntary Termination of Parental Rights filed on April 26, 2016, by Paternal Grandmother, R█████ S█████ ("Grandmother"), in regard to the rights of her grandchildren, J█████ H█████ and S█████ M█████ ("Children"). Grandmother seeks to terminate the parental rights of the child's biological father, G████ H█████ ("Father"), and biological mother, T█████ M█████ ("Mother") as a prerequisite to having the child adopted by an unrelated couple. A hearing on the Petition for Involuntary Termination of Parental Rights was held on November 17, 2016. Grandmother, R█████ S█████, was present with her counsel, Michael H. Collins, Esquire. Father, G████ H█████, was present with his counsel, Ravi Marfatia, Esquire. Mother, T█████ M█████, though properly served with notice of the hearing by publication in Tennessee and regular and certified mail in Indiana, failed to appear.

### Finding of Facts

1.    J█████ H█████ was born on February █, 2009. S█████ M█████ was born on June █, 2010. They are currently in the custody of their Paternal Grandmother, R█████ S█████, at 2354 River Road, Jersey Shore, Pennsylvania 17740.

2. The children's biological Father is ~~Grant Haynes~~, who resides at 731 Country Lane, #4, Lenoir City, Tennessee 37771.

3. The children's biological Mother is ~~Tammie Moore~~, who is believed to currently reside in Indiana. Mother's prior residence was believed to be in Tennessee.

4. A petition for Dependency and Neglect was filed by the Department of Children's Services for the State of Tennessee on or about July 27, 2012, at which time the Children were ordered into the custody of the State of Tennessee and placed in a foster home.

5. Grandmother filed a Petition for Custody on or about the same date and initiated an Interstate Compact on the Placement of Children ("ICPC") at that time, and Grandmother was approved as an appropriate placement on or about March 20, 2013.

6. The Children have resided with Grandmother since February 2013.

7. On April 12, 2013, Greene County, Tennessee, Juvenile Court Judge Kenneth Bailey, Jr. issued an Order releasing the Children from the temporary custody of the State of Tennessee and placed in the care and custody of Grandmother.

8. In January of 2014, Grandmother, through an adoption counselor with Catholic Social Services, was introduced to a couple in Pike County that was looking to become adoptive parents.

9. Michael and Tracy Pappalardo's first contact with the Children was on January 5, 2014. The Children spent overnights with the Pappalardos on January 8, 2014, and January 9, 2014, and on January 12, 2014, began to reside at the Pappalardo home.

2

10. At some point shortly after the Children began living with the Pappalardos, Grandmother's then-attorney, Lori Rexroth, Esquire, prepared a "Stipulated Custody Order," granting Grandmother and the Pappalardos shared legal and physical custody of the Children.

11. Said "Stipulated Custody Order" was not dated and was never filed and made an Order of Court.

12. The Pappalardos believed that the parental rights of Mother and Father were being voluntarily terminated in Tennessee, and that they would ultimately adopt the Children.

13. On November 24, 2014, Grandmother and her daughter (paternal aunt) removed the Children from their daycare, and Grandmother served the Pappalardos with a "Notice of Revocation and Rescinding Agreement for Custody."

14. In the 10 months the Children lived with the Pappalardos, Grandmother never informed Father of their whereabouts.

15. In January of 2015, Grandmother again attempted to place the Children, this time with her cousin's daughter, Kristen Probst. The Children stayed for approximately 5 weeks before Grandmother was asked to come get them.

16. Grandmother did not inform Father that the Children were living with the Probst family.

17. In 2014, Father had $2,411.00 in child support deducted from his paychecks.

3

18. Sometime in 2015, Grandmother filed a Petition for Involuntary Termination and Adoption in Greene County Circuit Court, Tennessee.

19. Father attempted to arrange a visit in Pennsylvania in February 2015 for Justin's birthday but was unable to follow through.

20. Father saw the Children in June of 2015 when he came to Pennsylvania for his grandmother's funeral. He spent time with the Children at his sister's cabin.

21. Father saw the Children on the weekend of October 11, 2015, when he traveled to Pennsylvania.

22. A hearing was held in Green County, Tennessee, on October 30, 2015, wherein Grandmother voluntarily dismissed her Petition for Termination and Adoption.

23. The Order dated December 15, 2015, indicated that Father may continue to visit with the Children in Pennsylvania as agreed upon by the parties, and that Grandmother should in good faith consider expanding Father's contact with the Children upon proof of his stability and appropriate interaction with Grandmother and the Children.

24. Specifically, as proof of his stability, Father was requested to consider providing proof of the following: his ability to remain drug and alcohol free, his ability to maintain regular employment and financially support the Children, his ability to obtain and maintain an appropriate home for at least six months, and his ability to maintain contact with the Children and speak to them about topics that are appropriate and productive.

4

25. The Order dated December 15, 2015, recognized that permanency and stability for the Children should be accomplished in an expeditious manner and authorized both Grandmother and Father to take whatever action necessary through the filing of any action in the appropriate court.

26. From October 2015 to April 2016, Father attempted to contact Children by texting Grandmother and requesting that she have the Children call him. Father testified that he texted Grandmother several times per week and Grandmother often failed to reply to his texts or was evasive concerning the Children's whereabouts.

27. Father testified that in December 2015 he paid a retainer fee of $2,500 to an attorney in Tennessee for the purpose of filing a Petition for Custody.

28. Grandmother met with Lois Williams of the Eckels Adoption Agency on December 31, 2015.

29. Ms. Williams met with the Children in early January 2016, and they expressed a desire for a "young mother and father who do fun activities."

30. The family chosen by Ms. Williams had gone through her home study and were on her approved list. The Children went to stay with the family towards the end of the 2016 school year.

31. Grandmother filed a Petition to Involuntarily Terminate the Parental Rights of Mother and Father on April 26, 2016.

32. A Report of Intention to Adopt was filed by the proposed adoptive parents on June 20, 2016.

5

33. On June 30, 2016, Father, through his counsel Keith Pope, Esquire, filed an Emergency Petition for Restraining Order and to Transfer Temporary Legal Custody, requesting that he be granted temporary full legal and physical custody of the Children due to Grandmother's neglect of the Children.

34. On July 20, 2016, the undersigned Judge and Tennessee Circuit Court Judge Tom Wright held a telephone conference to discuss jurisdiction. It was determined that Pennsylvania is the appropriate forum for litigation of any interests related to the Children.

35. By Order dated July 20, 2016, Tennessee relinquished jurisdiction and transferred Father's emergency petition to Lycoming County, Pennsylvania.

36. Mother, T████ M████, has struggled with drug and alcohol addiction and has not seen the Children in approximately four years. Her whereabouts are unknown, but it is believed that she currently resides in Indiana.

37. Mother has not made any attempts to contact the Children in person, by telephone, or through the mail, in at least four years.

## Discussion

Grandmother argues that the basis for termination in this case may be found in 23 Pa.C.S. §2511(a)(1) and (2), which provides as follows:

§2511. Grounds for Involuntary Termination
(a) GENERAL RULE.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

6

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

A court may terminate parental rights under Section 2511(a)(1) where a parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least six months prior to the filing of the termination petition. In the Interest of C.S., 761 A.2d 1197, 1201 (Pa. Super. 2000).

The Court should consider the entire background of the case and not simply mechanically apply the six month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his . . . parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

In re: B.N.M., 856 A.2d 847, 855 (Pa. Super. 2004), appeal denied, 582 Pa. 718, 872 A.2d 1200 (2005) citing In re: D.J.S., 737 A.2d 283, 286 (Pa. Super. 1999).

In determining what constitutes parental duties, the Pennsylvania Supreme Court has said:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent "exert himself to take and maintain a place of importance in the child's life."

7

With these principles in mind, the question whether a parent has failed or refused to perform parental duties must be analyzed in relation to the particular circumstances of the case. A finding of abandonment, which has been characterized as "one of the most severe steps the court can take," will not be predicated upon parental conduct which is reasonably explained or which resulted from circumstances beyond the parent's control. It may only result when a parent has failed to utilize all available resources to preserve the parental relationship.

In re: Burns, 379 A.2d 535, 540 (Pa. 1977)(citations omitted).

"[P]arental rights are not preserved... by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her immediate physical and emotional needs."

In re Adoption of Godzak, 719 A.2d 365, 368 (Pa.Super.1998) (citation omitted).

The Court finds as of the date of the Petition to Involuntary Terminate their parental rights, Mother without question has failed to perform her parental duties for a period of time in excess of six (6) months. As Mother did not appear for the hearing, despite being served by publication in Tennessee and by certified and regular mail in Indiana, the Court did not have the benefit of hearing from her. It appears as though Mother has struggled with drug and alcohol addiction, and has been incarcerated on at least one occasion. Grandmother testified that she had not had contact from Mother in the six months preceding the filing of the Petition, and in fact had not heard from Mother since June of 2012. Father testified that the last time he had contact with Mother was in March or April of 2013. During the entire time the Children have been in Grandmother's care, Mother never once contacted them, financially supported them, or sent cards and gifts for their birthdays or holidays. Although the Petitioner is required to prove only one of the factors of 23 Pa.C.S. §2511(a)(1) in order to establish grounds for termination,

8

this Court is satisfied that Mother's actions, or lack thereof, are evidence of both a failure to perform parental duties for a period far in excess of six months as well as a settled purpose to relinquish parental claim to the Children.

Father was present for the termination hearing, and vehemently objected to the proposed termination of his parental rights. Throughout his testimony, Father insisted that he has consistently attempted to maintain contact with his Children over the years and that Grandmother has constantly put up obstacles to thwart his efforts. Father introduced, as evidence of his attempts to maintain contact with Children, text messages he sent to Grandmother requesting to speak with them. Father testified that in 2013 through 2014, he contacted Grandmother via text and telephone approximately 2-3 times per week, and sometimes as often as every day. He testified that Grandmother often made it difficult by not answering calls or replying to his texts. He further testified that he had suspicions that the Children were somewhere else, because Grandmother would not let him talk to them. The Tennessee Order entered April 12, 2013, contained a no-contact provision between Mother and Father and the Children. Father testified that he was not aware of such provision, and Grandmother, despite knowing that there was such a provision, testified that she did not prevent Father talking to the Children, but that his conversations and interactions were often inappropriate.

This Court struggles with the fact that Father put forth so very little effort to not only maintain a relationship with the Children, but to actively regain custody. Father last saw the Children in October 2015, when he was in town for the weekend. Prior to that, he saw the Children in June 2015 when he was in town for his grandmother's funeral.

When Grandmother withdrew/dismissed her Petition for Termination and Adoption in Tennessee, the Order dated December 18, 2015, following the hearing on October 30, 2015, indicated Father's contact and time with the Children was to be expanded by Grandmother upon proof of his stability. Among other things, Father was encouraged to provide evidence of the following as proof of his stability: his ability to remain drug and alcohol free, his ability to maintain a state of good mental health and willingness to seek or attend treatment in order to facilitate a positive relationship between himself and the Children, his ability to maintain regular employment in order to financially support the Children, his ability to maintain appropriate housing for at least six months, and his ability to maintain consistent and appropriate contact with the Children.

At the hearing, Father provided paystubs for 2014, which included an automatic deduction for child support. Father testified that he has been an automobile technician at his current place of employment for approximately five months and earns $12.00 per hour. Father also testified that he has been involved with the VA since his exit from the military in 2007, and that his involvement includes counseling. Father testified that he currently lives by himself in a 2 bedroom trailer. It appears as though none of these facts were ever conveyed to Grandmother, despite the Tennessee Order suggesting that Father provide her with proof of his ability to accomplish and maintain those very things in order to have his visitation with his Children expanded. Father's efforts in the six months prior to the petition being filed were limited to texting and calling, and two empty promises of visits.

10

According to Father, the multitude of texts he sent to Grandmother between October 2015 and April 2016 resulted in him being able to speak to the Children approximately 3 or 4 times. Grandmother testified that she did not prevent Father from speaking to the Children, but he often would request to talk to them after they had already gone to bed for the night and she did not wake them up to speak with him. Father testified that he did not send the Children cards or gifts on their birthdays or holidays because he did not know where they were located, because Grandmother refused to provide him with her specific address. This Court finds Father's accusations that Grandmother purposely set up roadblocks to prevent him from maintaining contact with the Children to be invalid.

When questioned about why he waited so long to take any action regarding the custody of his Children, Father testified that he paid a retainer of $2,500 to his attorney in December 2015, for the purpose of filing a custody complaint in Tennessee. He testified that he did this because Michael Pappalardo encouraged him to do so. However, the Emergency Petition for Restraining Order and to Transfer Temporary Legal Custody was not filed until June 30, 2016, which was *after* Grandmother's Petition for Involuntary Termination of Parental Rights was filed. The GAL cited the case of **In the Interest of M.S.K.**, 936 A.2d 103 (Pa. Super. 2007), in which the court held that an attorney's negligence in failing to file an appeal to an order terminating parental rights was not a sufficient basis to allow father to appeal *nunc pro tunc*. Somewhat similarly, Father cannot use his attorney's failure to promptly file the custody action as an excuse for not affirmatively working towards fulfilling his parental obligations. If Father was as

11

committed to obtaining custody of his Children as he testified to, he should have and would have followed up with his attorney far in advance of the Petition for Involuntary Termination being filed.

As noted, a parent has an affirmative duty to provide love, support, and guidance for his or her children. "A parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available resources to preserve the parental relationship and must exercise "reasonable firmness" in resisting obstacles placed in the path of maintaining the parent-child relationship." In re Adoption by Shives, 525 A.2d 801, 803 (Pa. Super. 1987). Father argues that he used every resource available to him to overcome the obstacles that Grandmother put in place to prevent him from seeing or maintaining a relationship with the Children. This Court disagrees. Father claims that he did not know Grandmother's address and that precluded him from (1) coming to visit his Children and (2) sending them cards, letters, and gifts. This Court finds it incredulous that, with modern technology, Father could not use the internet to find Grandmother's address for the purpose of sending letters, cards, or gifts, or for traveling to Pennsylvania to visit with the Children. Furthermore, Father could have maintained appropriate and consistent contact with the Children through programs such as Skype or Facetime. Father appears to blame everyone else for the fact that he has had very little contact with the Children over the last several years. However, this Court finds that Father exhibited a lackadaisical attitude towards his parental responsibilities and was content to sit back and allow someone else to tend to the everyday needs and welfare of his Children. Father exhibited no urgency in

12

satisfying the factors suggested by the Tennessee judge which granted custody of his Children to Grandmother but provided an outlet for having his visits and contact with the Children increased. Even when he was accomplishing and maintaining the conditions outlined in the Order, as he testified to at the hearing, he failed to provide proof to Grandmother or request to have his periods of visitation increased. Father's efforts were limited to texts and phone calls, and in the meantime the Children were longing for a more stable and permanent option. This Court is satisfied that Grandmother has proven, by clear and convincing evidence, a refusal or failure on the part of Father to perform parental duties for a period of at least six months preceding the filing of the Petition for Involuntary Termination of Parental Rights pursuant to 23 Pa.C.S. §2511(a)(1).

With respect to 23 Pa.C.S. § 2511(a)(2), the relevant inquiry before the court is as follows:

> In order to terminate parental rights pursuant to 23 Pa.C.S.§2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003). This Court has long recognized that "[p]arents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." In re A.L.D., 2002 PA Super 104, 797 A.2d 326, 337 (Pa. Super. 2002) (internal citation omitted). "[A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or

13

availability of services, may properly be rejected as untimely or disingenuous." Id. at 340 (internal citation omitted).

In the case of Mother, this Court without hesitation finds that there has been repeated incapacity and neglect of the Children which has caused them to be without essential parental care necessary for their physical and mental well-being. While there was very little testimony about Mother due to the fact that she has not been seen by Grandmother or Father and, therefore also the Children, in approximately 4 years, that fact in and of itself is evidence of her incapacity and neglect. Mother has issues with drug dependency and has spent time being incarcerated. Mother has not reached out to Father or Grandmother in the last four years to make any attempt to reestablish a relationship with the Children. This Court is satisfied that Grandmother has proven that Mother's incapacity and neglect cannot or will not be remedied by her.

Father argues that Grandmother has not proven that Father has met the criteria for termination of his parental rights pursuant to 23 Pa.C.S. §2511(a)(2) because Father has remedied any conditions which led to the Children being without essential parental care, control or subsistence necessary for their physical or mental well-being. Father testified to the fact that he is employed, goes to counseling and receives services through the VA, and has a stable residence. While this does indicate a willingness on the part of Father to remedy the refusal and neglect which caused him to initially lose custody, Father did not bring these accomplishments to the attention of Grandmother or the Court and did not actively pursue regaining custody of the Children until after the Petition for Termination was filed. The Court finds that Grandmother does not need to

14

prove 23 Pa.C.S. §2511(a)(2) because she had proven by clean and convincing evidence that Father has evidenced both a settled purpose of relinquishing his parental claim to the Children and failed to perform his parental duties for far longer than the statutory requirement of six months preceding the filing of the Petition for Involuntary Termination.

As the statutory grounds for termination have been met, the Court must next consider the following:

> 23 Pa.C.S. § 2511(b) OTHER CONSIDERATIONS.—The Court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

The Court must take into account whether a bond exists between the child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. In the Interest of C.S., supra, at 1202. When conducting a bonding analysis, the Court is not required to use expert testimony. In re: K.K.R.-S., 958 A.2d 529, 533 (Pa. Super. 2008) (citing In re: I.A.C., 897 A.2d 1200, 1208-1209 (Pa. Super. 2006)). "Above all else . . . adequate consideration must be given to the needs and welfare of the child." In re: J.D.W.M., 810 A.2d 688, 690 (citing In re: Child M., 681 A.2d 793 (Pa. Super. 1996), appeal denied, 546 Pa. 674, 686 A.2d 1307 (1996)). A parent's own feelings of love and affection for a child do not prevent termination of parental rights. In re: L.M., 923 A.2d 505, 512 (Pa. Super. 2007).

15

Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the *intangible* dimension of the needs and welfare of a child--the love, comfort, security and closeness--entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the children's needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

<u>In the Interest of C.S., supra., at 1202 (citations omitted).</u>

In the present case, given that the Children have not seen or interacted with Mother in approximately four years or with Father in over a year, there is not a significant bond between Mother or Father and Children. Father testified that the Children refer to him as "Dad" or "Daddy," however, the GAL testified that they referred to him as "G███," and that they call the prospective adoptive parents "Mom" and "Dad." Termination of Mother's and Father's rights would not destroy an existing necessary and beneficial relationship as there currently exists no relationship between the Children and their biological parents. This Court has no doubt from his testimony that Father loves and cares for his Children. However, he has failed to perform his parental obligations, and any efforts he has made to maintain a relationship with the Children or regain custody of them have been too little, too late. There is no longer a necessary and beneficial bond between Father and Children that would be destroyed by terminating his parental rights.

The Children have been moved around multiple times in their young lives, including two failed attempts by Grandmother to find a more traditional and stable home life for them. Both Grandmother and Ms. Williams testified that the Children have

16

expressed their desire to be a part of a stable, two-parent family. For several years, Grandmother stepped in and assumed the parental responsibilities that Mother and Father were unable or unwilling to fulfill. Grandmother believes it is in the Children's best interest for them to be adopted by the couple with whom they are currently placed, and that they be raised by two loving parents and this Court agrees. The GAL testified that the Children are bright, articulate kids who are thriving and happy in their current home. The Children are bonded to their prospective adoptive parents, and have been longing to be part of a loving, stable, permanent family. This Court finds that terminating the rights of Father and Mother and allowing the adoption to proceed will best serve the needs and welfare of the Children.

### Conclusions of Law

1. The Court finds that Grandmother has established by clear and convincing evidence that G██████ H██████ and T██████ M██████, by conduct continuing for a period of at least six months immediately preceding the filing of the petition have refused or failed to perform parental duties pursuant to 23 Pa.C.S. §2511(a)(1) .

2. The Court finds that Grandmother has established by clear and convincing evidence that T██████ M██████, has exhibited repeated and continued incapacity, abuse, neglect or refusal which has caused the children to be without essential parental care, control or subsistence necessary for their physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by them pursuant to 23 Pa.C.S. §2511(a)(2).

3.    The Court finds that Grandmother has established by clear and convincing evidence that no bond exists between G██████ H██████ or T████████ M█████ and the children and that there would be no detriment to the developmental, physical and emotional needs and welfare of J██████ H██████ and S████████ M█████ by the termination of their parental rights.

Accordingly, the Court will enter the attached Decree.

By the Court,

Joy Reynolds McCoy, Judge

JRM/jel

cc.    Michael Collins, Esquire
      Ravi Marfatia, Esquire (Public Defender's Office)
      Angela Lovecchio, Esquire
      Gary Weber, Esquire
      Jerri Rook, Judge Joy McCoy's office

18